56 A.3d 501

**FIDELITY FIRST HOME MORTGAGE COMPANY**

v.

Charlene WILLIAMS.

No. 726, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Nov. 27, 2012.

Howard J. Schulman (Marie J. Ignozzi, Schulman & Kaufman, LLC, on the brief), Baltimore, MD, for Appellant.

Joseph M. Creed (Timothy F. Maloney, Joseph, Greenwald & Laake PA, on the brief), Greenbelt, MD, for Appellee.

Panel: DEBORAH S. EYLER, MATRICCIANI and RAYMOND G. THIEME JR. (Retired, Specially Assigned), JJ.

EYLER, DEBORAH, S., J.

In the Circuit Court for Prince George's County, Charlene Williams, the appellee, sued Fidelity First Home Mortgage Company, Inc. ("Fidelity First"), the appellant, a mortgage broker; and two former Fidelity First employees, James Fox and James Dan. She alleged, *inter alia,* that Fox and Dan engaged in a fraudulent foreclosure rescue scheme that caused her to lose title to and be deprived of the equity in her home. She further alleged that, as Fox's employer, Fidelity First was vicariously liable for fraud, breach of fiduciary duty, and violations of the Protection of Homeowners in Foreclosure Act

("PHIFA"), Md.Code (2003 Repl.Vol., 2006 Supp.), sections 7–301–7–321 of the Real Property·Article ("RP").[1] She also alleged that Fidelity First negligently supervised and/or retained Fox.[2]

The case was tried to a jury for three days. On the first day of trial, Williams voluntarily dismissed her claims against Fox and Dan, proceeding solely against Fidelity First. The court denied Fidelity First's motions for judgment at the close of Williams's case and at the close of all the evidence. The jury returned a verdict in favor of Williams on all counts, awarding her $70,000 in compensatory damages and $150,000 in punitive damages. Judgment was entered for $220,000.

Fidelity First timely moved for judgment notwithstanding the verdict ("JNOV"), and Williams moved for treble damages and attorneys' fees and costs. After a hearing, the court denied the JNOV motion and the motion for treble damages, but awarded Williams $80,034.50 in fees and $3,902.90 in costs.

Fidelity First noted an appeal, presenting five questions for our review, which we have reordered and rephrased:

I.   Was the evidence legally sufficient to prove by a preponderance of the evidence that Fidelity First negligently hired and/or retained Fox?

II.  Was the evidence legally sufficient to prove by a preponderance of the evidence that Fox was acting within the scope of his employment when he engaged in fraud, breaches of fiduciary duty, and violations of PHIFA?

---

1.   PHIFA was repealed in 2008, reenacted by Chapters 5 and 6 of the Maryland Laws of 2008, and recodified in Sections 7–301 to 7–325 of the Real Property Article, Maryland Code (2003 Repl.Vol., 2009 Supp.). The transaction at issue in this case took place after PHIFA was enacted in 2005, but prior to the 2008 revisions. All references to the Act in this opinion are to the version in effect at the time of the transaction.

2.   Williams also set forth claims against Fidelity First for promissory estoppel, unjust enrichment, and intentional infliction of emotional distress, all of which she voluntarily dismissed during trial.

III. Did the trial court err in allowing the jury to award punitive damages against Fidelity First solely on the basis of *respondeat superior?*

IV. Did the trial court err in allowing the jury to hold Fidelity First vicariously liable for Fox's violations of PHIFA?

V. Did the trial court err or abuse its discretion in its award of attorneys' fees?

For the reasons to follow, we conclude that the evidence was legally sufficient to support the verdicts and that there was no error or abuse of discretion by the court. Accordingly, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

Fidelity First, a Maryland corporation, is a licensed mortgage broker with its principal place of business on Bestgate Road in Annapolis. Daniel Eubanks is its president and sole owner.

At all relevant times, Fidelity First employed between eleven to fifteen loan officers, also known as loan originators. The loan officers were in direct contact with potential borrowers. They assisted potential borrowers in completing loan applications and collecting the necessary documentation to support their applications. They also evaluated each potential borrower's eligibility for a mortgage loan. In addition, the loan officers engaged in solicitation efforts to find potential borrowers and persuade them to refinance their mortgages through Fidelity First.

Each loan application went through two levels of review before being sent to a lender. First, a loan processor with Fidelity First reviewed it. Second, Eubanks personally reviewed it.

For each loan it closed with a lender Fidelity First received an origination fee. The fee was split between Fidelity First and the loan officer under a "tiered" commission schedule that took into account the amount of the origination fee and the

loan officer's production record. Ordinarily, commissions ranged between 35% and 50%.

On August 25, 2003, Fidelity First hired James Dan as a loan officer. About five months later, on January 20, 2004, James Fox also was hired as a loan officer. The two men's desks were near each other and they became friends. According to Fox, Dan was his "mentor" at Fidelity First.

By his own admission, Dan was not a good "producer," meaning that he did not successfully close many loans. He also was an active alcoholic. In October of 2004, he missed work because of his alcohol problem. At the end of 2004, he stopped coming to work entirely and was terminated from employment. After Dan completed an alcohol rehabilitation program, Eubanks agreed to rehire him. Dan continued to be a poor producer, however. On July 15, 2005, Eubanks told Dan that he needed to produce loans that brought in $15,000 in origination fees in the next 30 days or he would be fired. Forty-six days later, on August 31, 2005, Dan was terminated for "lack of production, forging pay history, [and] ordering own title."

Unlike Dan, Fox quickly became an excellent producer and was rewarded with higher commission rates, maxing out at 55%. Fox also was caught forging documents, however, on at least three occasions. The first instance happened in December of 2004 and resulted in a reprimand. The second forgery occurred in July of 2005. It involved a loan application on which Fox was assisting Dan. This was the forgery mentioned as one of the reasons for Dan's termination. Fox's employment file reflects that he was given a "final warning" for this incident. Eight months later, in March of 2006, an underwriter for a lender discovered that a CPA letter in support of a loan application completed by Fox had been fabricated.[3] As a result, the loan did not close. Fidelity First suspended Fox for one week for this transgression, but did not terminate him.

---

**3.** A CPA letter is a letter from a certified public accountant verifying a borrower's income and assets.

The foreclosure rescue scheme central to this case began about a year after Dan's termination from Fidelity First and while Fox still was employed there. Between April of 2006 and July of 2007, Fox, and, in some cases, Dan, were involved in at least eight foreclosure rescue transactions. The transactions followed the same basic pattern. Fox identified distressed homeowners who were unable to qualify for traditional mortgage refinancing due to poor credit, but who owned equity in their homes. He and sometimes Dan advised these homeowners that they could assist them in refinancing their mortgages by using Fox's or Dan's own credit. The homeowners were convinced that they could avoid losing their homes to foreclosure by selling their homes to Fox, Dan, or a straw buyer, but remaining in the properties as tenants. This purportedly would allow the homeowners to rehabilitate their credit ratings and eventually buy back their houses at a more favorable mortgage loan interest rate. (As we shall explain, however, the homeowners may or may not have understood that they were selling their homes.) Fox and Dan promised to pay the mortgages on the properties for six months to a year, at which time the homeowners would be able to re-acquire title to their properties.

To facilitate the property purchases, Fox, Dan, or a straw buyer would apply for and obtain mortgage loans in their own names. In at least three of the transactions, Fidelity First was the mortgage broker. The loan applications contained materially false representations with respect to the borrower's income, assets, and intent to occupy the home. In each transaction, the borrower represented that he or she would make a cash down payment, and the mortgage loans only covered a portion of the purchase price. In fact, as we shall discuss in more detail with respect to the Williams transaction, the seller's own proceeds from the sale of the property were used to cover the cash down payment. Fox and Dan pocketed the remaining proceeds.

The first two fraudulent transactions were carried out in April and June of 2006. In each transaction, Fox applied for and received a mortgage loan in his own name to use to

purchase the distressed homeowner's property. Neither of these loans originated through Fidelity First.[4] In each transaction, Fox, without the seller's knowledge, used the seller's own proceeds from the sale to cover his down payment and retained the remainder of the proceeds for himself. Ultimately, Fox did not pay on the mortgage loans and they went into default.

Charlene Williams was the homeowner in the third transaction, which took place in August of 2006. Williams grew up in the property, a house located at 1435 Eastern Avenue in Capital Heights. Her parents had owned the house free and clear. In 2003, Williams purchased the house from her father,[5] who was the sole owner. Williams obtained a mortgage loan in the principal amount of $103,000. Her monthly payments were approximately $725 per month.

In 2005, Williams, who worked as a cashier at a grocery store, began having financial problems and ceased making her mortgage payments. Her lender initiated a foreclosure proceeding against her. On September 29, 2005, Williams filed for Chapter 13 bankruptcy, resulting in a stay of the foreclosure proceeding.

In February of 2006, Williams received a solicitation letter from Fidelity First. The letter stated, in pertinent part:

> Our files indicate that you have an outstanding mortgage balance and that you have recently been dismissed from a Chapter 7 Bankruptcy.[6] You have been pre-approved for a lower interest rate and/or debt consolidation. This could

---

4. In the first transaction, the distressed homeowner was referred to Fidelity First for a refinance by his bankruptcy attorney and ultimately began working with Fox. Fox did not originate the loan through Fidelity First, however.

5. At that time, Williams's father was ailing with Alzheimer's Disease. Williams's brother had been granted power of attorney in her father's legal affairs. He deeded the property to Williams on behalf of her father.

6. Williams had emerged from Chapter 7 bankruptcy six years prior to this letter.

mean a savings of up to $500 or more per month. Please call your customer service representative toll free at 1–866–266–2544 between 10AM and 8 PM EST for your monthly savings or go to our website at www.fidelityfirst.net.

Sincerely,
Shawn Murphy
Director of Customer Service
Fidelity First

Shawn Murphy was not an employee of Fidelity First. In fact, she was a fictitious person named after one of Eubanks's friends from college. Eubanks assigned different names to the different types of solicitation letters that Fidelity First sent to potential borrowers. When a potential borrower called in response to a solicitation, the person receiving the call could identify the type of solicitation the potential borrower had received based upon the name of the customer service agent the potential borrower requested. This allowed Fidelity First to direct the call to the appropriate loan officer and to keep track of which types of solicitations were generating business.

On or about February 21, 2006, Williams called Fidelity First in response to the solicitation letter. She subsequently received a return call from Fox. After obtaining some information from her, Fox informed Williams that he could assist her in refinancing the mortgage on her property.

Around April of 2006, Fox went to Williams's house. He told her he would arrange for an appraisal of her property.

Subsequently, Fox and Dan asked Williams to meet them at the federal district court in Greenbelt. She did so. On April 14, 2006, the bankruptcy court entered an order "authoriz[ing Williams] to refinance a loan secured by [the] property" so long as "all debts secured by present liens upon the property" would be paid from the settlement proceeds.

On May 11, 2006, Williams executed a written sales contract to sell the property to Dan for $225,000. Williams does not recall signing this document, although she acknowledged the signature on the contract appears to be hers.

The next day, Dan applied for a mortgage loan with First National Bank of Arizona ("First National"). Fox was the loan officer on the application and Fidelity First was the mortgage broker. On his application, Dan made numerous misrepresentations about the amount of his annual income, his savings, and real property he claimed to own. He also misrepresented that he had been employed as a "producing manager" at "Investor's 1st Mortgage, LLC" for nearly three and one-half years and was currently earning $9,500 per month.[7]

Dan's loan application was approved by Jim Leonard, a loan processor for Fidelity First. As discussed, the file also would have been reviewed by Eubanks in the ordinary course of business, although Eubanks denied having reviewed this particular file.

On May 17, 2006, the property was appraised for $235,000. Williams's outstanding mortgage balance was approximately $108,000.

On August 4, 2006, settlement was held at Everclear Title Company ("Everclear"), in its office in Annapolis. Appearing at the settlement were Fox, Dan, Williams, and Maxwell Cohen, a settlement attorney employed by Everclear. During settlement, Williams signed a deed conveying the property to Dan. Dan and Williams also signed a contingent deed reconveying the property to Williams. Cohen represented that he would hold that deed in escrow for a period of three years.

According to the HUD–1 Settlement Statement, Dan financed the $225,000 purchase price and $11,620.71 in settlement charges with a mortgage loan of $180,000 from First National; a seller's credit of $13,500; and $44,420.07 in cash. Dan presented Everclear with a personal check in that amount. As we shall explain, he used Williams's proceeds from the transaction to cover the down payment.

---

7. In fact, as mentioned, Dan had been terminated from Fidelity First less than a year earlier.

Also as documented in the HUD-1, the total money brought to the settlement by Dan (the mortgage loan, seller's credit, and cash) were used to pay $11,145.58 in Williams's settlement charges; to satisfy her first and second mortgage loans of $108,874.28 and $2,669.52 respectively; and to satisfy a $3,726.74 personal loan and $5,735 in credit card debt. An additional $16,754.45 was paid to the bankruptcy trustee to satisfy Williams's remaining debts. With the addition of $500 in earnest money previously paid by Dan, Williams was to receive $63,893.79 in net proceeds from the sale. Everclear issued a check to her in that amount. Fox and/or Dan retained the check following settlement.

Fidelity First received $5,128.11 in total fees from the transaction, including a $3,600 origination fee, which it split evenly with Fox.

Soon after settlement, Williams, Dan, and Fox traveled to a Provident Bank in Clinton, where Williams maintained an account. Williams endorsed the $63,893.79 check over to Dan and he cashed it. He gave Williams $3,000 of this amount. Dan and Fox had told Williams that the remaining $60,893.79 would be "escrowed" to cover her mortgage payments. (Of course, the mortgage no longer was in Williams's name as she had just sold the property to Dan.) In fact, Dan deposited the remaining proceeds into his own personal checking account. The $44,420.07 check representing Dan's down payment was drawn on this account.

In October of 2006, Everclear delivered to Fox a second check made out to Williams in the amount of $11,804.62, representing a refund for overpayments made to her creditors out of the settlement proceeds. Fox called Williams and arranged to meet her at a Bank of America in Annapolis where he maintained a personal checking account. At that location, Williams endorsed the check over to Fox. He gave her $3,000 in cash and told her the remaining amount would be deposited into her "escrow" account. Instead, the check was deposited into Fox's personal checking account.

In each of the three months following settlement, Fox arranged to meet with Williams to facilitate the payment of the mortgage on the Property. Williams thought, incorrectly, that the mortgage loan still was in her name and that she was paying the loan with the money Fox and Dan were holding in escrow for her. In fact the mortgage was in Dan's name and Williams was, essentially, making rental payments. Fox would meet Williams at a BJ's Warehouse in Bowie. He would bring cash in the amount of Dan's monthly mortgage payment ($857.33). Fox and Williams would enter BJ's and purchase a money order in that amount, which Williams put in her name. They then would mail the money order to the mortgage company. Fox later would mail Williams a "receipt" for the mortgage payment.

In December of 2006 and January of 2007, Fox told Williams he would pay the monthly mortgage payments directly on her behalf. He mailed her receipts for the mortgage payments for those months. Thereafter, Fox ceased all contact with Williams. She called Dan to inquire about the status of her mortgage payments. Dan advised her that Fox was busy planning his wedding.

Thereafter, Dan continued to pay the mortgage for several months and then ceased paying.

Williams first discovered that she no longer owned the property in 2007 when she was served with an eviction notice. She investigated and found that she was "a tenant in [her] own home." She also learned that Dan's mortgage was in foreclosure. She tried to contact the mortgage lender, but its representatives would not speak to her because her name was not on the loan.

In August of 2009, in the Circuit Court for Prince George's County, Williams filed an eight-count complaint naming Fox, Dan, and Fidelity First as defendants.

In December of 2009, Fox and Dan were indicted in federal court for wire fraud and conspiracy to commit wire fraud. The following month, Williams filed an eleven-count amended

complaint.[8]  As relevant here, she alleged that Fidelity First was vicariously liable for fraud, breach of fiduciary duty, violations of PHIFA, promissory estoppel, unjust enrichment, and intentional infliction of emotional distress.  She alleged that Fidelity First was directly liable for negligently hiring, supervising, and/or retaining Fox. She sought $500,000 in compensatory damages; $500,000 in punitive damages; and attorneys's fees and treble damages under PHIFA.

In June of 2010, Dan pleaded guilty in his federal criminal case on an agreed statement of facts.  In October of 2010, Fox did the same.  The statements of facts, which was admitted into evidence in the trial in this case, set forth the details of eight foreclosure rescue transactions.  Fox was a participant in all eight, while Dan participated as the purchaser in three of the transactions, including the Williams transaction.

The trial in this case commenced on February 7, 2011. That day, Williams voluntarily dismissed her claims against Fox and Dan. Her case against Fidelity First was tried for three days.  Williams testified and called four witnesses.

Calvin Wink, an assistant commissioner of enforcement in consumer services for the Financial Regulation division of the Department of Labor, Licensing and Regulation ("DLLR"), testified that, in 2007, Williams filed a complaint with his office.  He commenced an investigation and subpoenaed records from Fidelity First.  The records revealed, *inter alia,* that Fox and Dan had made material misstatements on the HUD–1 in the Williams transaction;  and that Dan had made material misstatements on his mortgage loan application. During the investigation, Wink spoke to Eubanks on one occasion by phone.  Eubanks told Wink that Fox and Dan perpetrated the scheme without his knowledge and that he (Eubanks) was an "absentee owner."  Wink also testified about PHIFA, explaining that it had been enacted in 2005 to

---

8.  Williams added claims against two additional defendants, Investor's 1st Mortgage, LLC, Dan's employer;  and Timothy King, a member of that entity.  She did not effect service upon these parties, however.

protect homeowners in foreclosure from exactly the type of fraudulent rescue scheme perpetrated against Williams.

Fox and Dan each testified about their employment history at Fidelity First and their involvement in the foreclosure rescue scheme. Fox further testified about the culture at Fidelity First, explaining that loan officers were under considerable pressure to produce and that failure to produce would lead to termination. He described a "motivational" contest that Eubanks sponsored known as "steak and beans." At the end of each month, Eubanks would take the loan officers to Ruth's Chris steakhouse. The loan officers with high production numbers got to order steak, while the loan officers with low production numbers could only order beans. Eubanks also encouraged his loan officers to go "dumpster diving" outside of the offices of large lenders to find the "leads" that these lenders had thrown out. Fox testified that Eubanks would post a picture of a "goose egg" above the desks of loan officers who failed to earn any commissions the prior month.

Finally, Williams called Eubanks as a witness in her case-in-chief. He acknowledged that Fox was not terminated from Fidelity First even though he was caught engaging in forgery on three separate occasions. Eubanks testified that he treated forgeries differently depending on the "severity" of the forgery. He explained that Dan was fired primarily for engaging in forgery. He could not explain, however, why Dan's employment file listed "lack of production" as the first ground for Dan's termination or why Fox was not also fired given that he and Dan both were involved in the forgery that immediately preceded Dan's termination.

Eubanks further testified that Fox had told him about his (Fox's) involvement in the foreclosure rescue transactions, which Fox referred to as "contract for deed," and had asked Eubanks to invest in his business. Fox explained that he was helping people to stay in their homes. Eubanks declined to participate, however, because he "did not want to be a landlord."

As to his knowledge about irregularities in these transactions, Eubanks explained that, about one month after settlement in the Williams transaction, a title company located next door to Fidelity First conducted a settlement of another of the Fox transactions. The owner of the title company knew Eubanks and contacted him. The owner told Eubanks that it appeared that Fox and Dan were using the seller's proceeds to cover the down payment on the property and that the seller had endorsed over the proceeds of the sale to Fox and/or Dan following settlement. Immediately thereafter, Eubanks testified that he told Fox he "did not want anything to do with any more of these files whatsoever in [his] office."

Nevertheless, after this admonition, Fox originated loans for two more foreclosure rescue transactions through Fidelity First. In the first such transaction, Fox was the borrower and the loan officer. On the loan application, he misrepresented his salary with Fidelity First. Eubanks acknowledged that that loan application was processed and approved by Fidelity First, but that the discrepancy was not caught. In the second transaction, Fox originated a loan for his stepfather to purchase a home from a distressed homeowner.

At the close of Williams's case, Fidelity First moved for judgment on all counts.[9] With respect to the counts for fraud, breach of fiduciary duty, and violations of PHIFA, counsel for Fidelity First argued that there was no evidence that Fidelity First was aware of or authorized the fraudulent foreclosure rescue scheme and that the evidence was legally insufficient to support a reasonable inference that this "side transaction" was carried out by Fox within the scope of his employment with Fidelity First. With respect to negligent supervision and retention, defense counsel argued that there was no evidence of any prior conduct by Fox of this nature, *i.e.,* foreclosure rescue schemes. As to the alleged violations of PHIFA, defense counsel maintained that PHIFA was inapplicable as a

---

9. As mentioned, Williams voluntarily dismissed her claims for promissory estoppel, unjust enrichment, and intentional infliction of emotional distress at this juncture.

matter of law because the property was not "in foreclosure" when the August 4, 2006 transaction occurred and that Fidelity First could not be held vicariously liable for any violations of the statute in any event. Finally, defense counsel argued that punitive damages could not be awarded on the basis of vicarious liability. The court denied the motion for judgment.

Fidelity First recalled Eubanks in its case-in-chief. He testified that, until the Williams transaction occurred, he had no knowledge that Fox and/or Dan was engaging in fraud or stripping equity from the homes they were purchasing. He explained that the Williams transaction was the first of the foreclosure rescue transactions in which the loan originated through Fidelity First and that, following that transaction, Fox originated two more loans through Fidelity First as part of the scheme. Neither of the subsequent transactions involved Dan, however, and for that reason, they "were not on [Eubanks'] radar." At the close of all the evidence, defense counsel renewed his motion for judgment on the same grounds. It was denied.

The jurors deliberated and, on February 9, 2011, returned a verdict in favor of Williams on all counts. They found by clear and convincing evidence that Fidelity First "acting through one or more of its agents, committed fraud against [Williams]." They found by a preponderance of the evidence that Fidelity First, "acting through one or more of its agents," breached a fiduciary duty owing to Williams and violated PHIFA; and that it had negligently supervised or retained Fox. They awarded Williams $70,000 in compensatory damages. The jurors further found by clear and convincing evidence that the actions of Fidelity First's agents "met the standard for punitive damages as defined by the Court in its instructions,", *i.e.*, the actions were committed with actual malice, and awarded Williams $150,000 in punitive damages.

On February 22, 2011, the court entered judgment in favor of Williams. That same day, Fidelity First moved for JNOV. It argued, as it had in its motion for judgment, that Williams had failed to adduce legally sufficient evidence to support the

jury's verdicts on the fraud, breach of fiduciary duty, and PHIFA counts because the evidence showed that Fidelity First's agent, Fox, was acting outside of the scope of his employment when he operated his foreclosure rescue scheme and stripped the equity from Williams's property. It further challenged the award of punitive damages as to the fraud and breach of fiduciary duty counts on the basis that Williams failed to prove that Fidelity First, as opposed to Fox, acted with actual malice.

Also on February 22, 2011, Williams moved for an award of treble damages and an award of attorneys' fees and costs, both pursuant to PHIFA.

On May 9, 2011, the court heard argument on the post-trial motions and ruled from the bench. It denied the motion for JNOV and the motion for treble damages. It granted Williams $83,937.40 in attorneys' fees and costs. On May 24, 2011, judgment was entered in favor of Williams in that amount. On May 31, 2011, Fidelity First noted this appeal.

We shall include additional facts as relevant to our discussion of the issues.

## STANDARD OF REVIEW

We review a challenge to the sufficiency of the evidence *de novo*. *Polk v. State*, 378 Md. 1, 7–8, 835 A.2d 575 (2003). "In a civil jury trial, if there is any evidence adduced, however slight, from which reasonable jurors could find in favor of the plaintiff on the claims presented, the trial court should deny the defendant's motion for judgment at the close of the evidence and submit the claims to the jury for decision." *Hoffman v. Stamper*, 155 Md.App. 247, 288, 843 A.2d 153 (2004), *rev'd in part on other grounds*, 385 Md. 1, 867 A.2d 276 (2005). A defendant may move for JNOV following an adverse jury verdict on the same grounds previously advanced. *See* Md. Rule 2–532; *Jacobs v. Flynn*, 131 Md.App. 342, 353, 749 A.2d 174 (2000). "We will find error in a denial of a motion for judgment or JNOV if the evidence does not rise above speculation, hypothesis, and conjecture, and does not

lead to the jury's conclusion with reasonable certainty." *Scapa Dryer Fabrics, Inc. v. Saville,* 418 Md. 496, 503, 16 A.3d 159 (2011) (citations omitted).

## DISCUSSION

### I.

### Negligent Supervision or Retention

In *Evans v. Morsell,* 284 Md. 160, 166, 395 A.2d 480 (1978), the Court of Appeals first recognized that an employer may owe a duty to members of the general public arising from its role in hiring, supervising, and retaining its employees. Quoting with approval an opinion of the Court of Appeals for the District of Columbia, the Court opined:

"One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment."

*Id.* (quoting *Fleming v. Bronfin,* 80 A.2d 915, 917 (D.C.1951)). The Court further explained that "[w]here an employee is expected to come into contact with the public . . . the employer must make some reasonable inquiry before hiring or retaining the employee to ascertain his fitness, or the employer must otherwise have some basis for believing that he can rely on the employee." *Id.* at 166–67, 395 A.2d 480. The nature and extent of the employer's duty of reasonable inquiry varies based upon the facts of each case. *Id.* at 167, 395 A.2d 480.

As in any action for negligence, a plaintiff asserting a cause of action for negligent supervision or retention must prove duty, breach, causation, and damages. *Cramer v. Hous. Opportunities Comm'n,* 304 Md. 705, 712–14, 501 A.2d 35 (1985). In the instant case, only the breach of the duty of reasonable inquiry is in dispute. Fidelity First contends the

evidence at trial was legally insufficient to prove a breach because Williams failed to elicit evidence that Fidelity First "knew, or should have known, of the Fox–Dan partnership, or that it knew or should have known that Fox engaged in a foreclosure rescue scam." [10] Williams responds that no such proof was required and that the evidence at trial showing that Eubanks knew that Fox had a history of forging documents was legally sufficient proof of a breach of the duty of care.

We summarize the evidence bearing on this issue in the light most favorable to Williams, as the non-moving party. Eubanks hired Fox in January of 2004. At that time, Fox had some "investment experience," but "no formal training per se as far as loan applications" or anything of that nature.

There was evidence from which reasonable jurors could infer that Eubanks tolerated and even encouraged forgery in the pursuit of closing more loans. As discussed, Fox routinely engaged in forgeries. He described this as a "learned behavior." He testified that he often would create false asset statements for loan applicants by using his own financial records and "cut[ting] and past[ing]" a loan applicant's name and other identifying information onto the document. "Wite–Out," according to Fox, was a loan officer's "best friend." He was caught forging documents on three occasions, including a complete fabrication of a CPA letter. The first two instances occurred prior to his initial contact with Williams and the third occurred after his first contact with her, but before he submitted the Dan loan application. He was reprimanded for the first two transgressions and was suspended for a week for the third.

Fox also testified that, on one occasion, Eubanks asked him to "fix [a] pay stub" so as to "enhance" the loan applicant's income in order to close a loan. Eubanks made this request

---

**10.** Fidelity First also suggests that Williams failed to articulate the nature of the duty or establish the standard of care. It did not make this argument in its motions for judgment at trial (or its motion for JNOV), however, and cannot raise it for the first time on appeal.

on the same day that he reprimanded Fox for creating the forged CPA letter.

Eubanks also was aware that Fox was engaging in "contract for deed" transactions with distressed homeowners because Fox repeatedly asked Eubanks to "invest" and told him he could guarantee him 20 percent equity. As mentioned, Eubanks declined to participate.

Williams received the Fidelity First solicitation letter in February of 2006, which, as discussed, was shortly before Fox was reprimanded for forgery for a third time. She called Fidelity First in response to that letter, provided some information, and later received a return call from Fox. Fox was the loan officer on Dan's loan in the Williams transaction. That loan application contained material misstatements with regard to Dan's income and assets. Fox also fraudulently misrepresented to Williams the nature of the transaction, leading her to believe she was refinancing her mortgage, rather than selling her home to Dan.

Fox, in his role as loan officer, was in regular contact with the general public. Fidelity First was on notice that Fox was willing to forge documents in order to close loans and earn commissions. Despite this knowledge and even though, pursuant to its own internal policies, forgery was a termination event, Fox was retained as an employee after three known instances of forgery. His job duties were not restricted in any way to limit his contact with the public. There was no evidence that Fox's loan applications were the subject of greater scrutiny after he was caught forging documents. This was evident from the fact that the loan application Fox submitted on behalf of Dan, which contained numerous material alterations, was approved by the processing department and by Eubanks. On this evidence, we have no difficulty in concluding that a reasonable juror could find by a preponderance of the evidence that Fidelity First was negligent in supervising and retaining Fox as an employee. On this basis alone, we would affirm the award of compensatory damages in favor of Williams.

## II.

### *Respondeat Superior*

██ Fidelity First argues that the evidence at trial was legally insufficient to sustain the verdict in favor of Williams on her claims for fraud, breach of fiduciary duty, and violations of PHIFA.[11] Fidelity First does not seriously dispute that the evidence was legally sufficient to prove that Fox and Dan engaged in fraud, breached fiduciary duties owing to Williams,[12] and violated PHIFA. It maintains, however, that this evidence did not support a reasonable inference that Fox was acting within the "scope of his employment" at the time of the tortious conduct. It asserts that while Fox's initial contact with Williams arose out his role as a loan officer, after Fox determined that Williams would not qualify for a refinance loan and decided, instead, to persuade her to participate in a foreclosure rescue transaction using Dan's credit, he ceased acting within the scope of his employment with Fidelity First. It emphasizes that it did not as a matter of course engage in foreclosure consultation and did not perform foreclosure rescue transactions. It also points out that Williams met with Fox outside of the office—at her home, at the local mall, at the federal district court and at Everclear; and that Fox and Dan also met outside of Fidelity First's offices to complete documents for the transaction.

Williams responds that the evidence that she was solicited by Fidelity First to refinance her mortgage; that she came

---

11. As we shall discuss, *infra*, Fidelity First also argues that it is exempt from the reach of PHIFA and that it may not be held vicariously liable under that statute. In this section, we consider only whether the evidence at trial was legally sufficient to prove that Fox was acting within the scope of his employment when he committed the alleged tortious conduct and violations of the statute.

12. In a footnote, Fidelity First suggests that Williams did not adequately identify the nature of the relationship giving rise to a fiduciary duty or articulate how it was breached. *See Kann v. Kann,* 344 Md. 689, 713, 690 A.2d 509 (1997) (holding that Maryland does not recognize a "universal or omnibus tort for the redress of breach of fiduciary duty"). It does not otherwise pursue this argument on appeal, however.

into contact with Fox via this solicitation; that Fox acted as the loan officer on Dan's loan; that Eubanks approved Dan's loan application; and that Fidelity First received an origination fee arising out of the transaction all demonstrate that the foreclosure rescue scheme was in furtherance of Fidelity First's business. She emphasizes that Eubanks was aware of Fox's history of forgery and of his new "side business" as evidence that the perpetration of the fraud was reasonably foreseeable.

Under the well-established rule of *respondeat superior,* an employer ordinarily is liable for the torts committed by its employees while acting within the scope of employment. In *Sawyer v. Humphries,* 322 Md. 247, 255, 587 A.2d 467 (1991), the Court of Appeals summarized the legal principles governing the scope of employment inquiry, opining that

> [t]he general test set forth in numerous Maryland cases for determining if an employee's tortious acts were within the scope of his employment is whether they were in furtherance of the employer's business and were "authorized" by the employer. In an often-quoted passage, the Court in *Hopkins C. Co. v. Read Drug & C. Co.,* 124 Md. 210, 214, 92 A. 478, 479–480 (1914), explained:
>
> > " 'The simple test is whether they were acts within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By "authorized" is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders.' " (quoting from *Wood on Master and Servant* § 279 (1877)).

The *Sawyer* Court further explained that the application of this test is fact dependent, with "few, if any, absolutes." *Id.* Among the pertinent considerations are four factors identified by the Court of Appeals in *East Coast Freight Lines, Inc. v.*

*Mayor & City Council of Balto.*, 190 Md. 256, 285, 58 A.2d 290 (1948):

> To be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master. *Mechem on Agency,* Section 36; *Huffcut on Agency,* Section 5; *American Law Institute, Restatement, Agency,* Section 228, comment (b).

■ When the employee's conduct is not expressly authorized by his employer, it " 'must be of the same general nature as that authorized, or incidental to the conduct authorized' " to fall within the scope of employment. *A. & P. Co. v. Noppenberger,* 171 Md. 378, 390, 189 A. 434 (1937)(quoting RESTATEMENT OF AGENCY § 229 (1933)). Section 229 of the RESTATEMENT (SECOND) OF AGENCY identifies ten factors relevant to this inquiry:

> (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal.

■ The foreseeability of the employee's conduct also is an "important factor." *Sawyer,* 322 Md. at 256, 587 A.2d 467 (whether the conduct is "expectable" or "foreseeable"); *accord Cox v. Prince George's County,* 296 Md. 162, 171, 460 A.2d 1038 (1983); *LePore v. Gulf Oil Corp.,* 237 Md. at 591, 600, 207

A.2d 451 (1965); *Central Railway Co. v. Peacock,* 69 Md. 257, 262, 14 A. 709 (1888).

"'An act may be within the scope of employment although forbidden or done in a forbidden manner; although consciously criminal or tortious; although done in part to serve the purposes of the servant or a third person.'" *Rusnack v. Giant Food, Inc.,* 26 Md.App. 250, 263, 337 A.2d 445 (1975) (citations omitted); *see also E. Coast Freight Lines, supra,* 190 Md. at 285, 58 A.2d 290. Section 231 of the RESTATEMENT (SECOND) OF AGENCY addresses "consciously criminal or tortious" conduct of servant. The comments to that section emphasize that the foreseeability and the seriousness of criminal conduct both are highly relevant in determining whether an intentional tort falls outside the scope of employment. For instance, "if a servant is directed to use any lawful means to overcome competition, the bribery of employees of the competitor, or the circulation of malicious stories, might be found to be within the scope of employment." *Id.* at comment (a). In contrast, "the murder of the competitor, although actuated solely by zeal for the master, would not be [within the scope of employment]." *Id.*

With these principles in mind, we return to the case at bar. Viewing the evidence at trial in the light most favorable to Williams, we conclude that a reasonable juror could find that Fox was acting within the scope of his employment when he perpetrated the fraudulent scheme against Williams. We explain.

Williams came into contact with Fox because Fidelity First solicited her. The February 2006 solicitation letter informed her that she had been "pre-approved" for a mortgage loan with a "lower interest rate." These representations were false. In response to the solicitation letter, Williams called Fidelity First and an unknown employee "took [her] information." She later received a return call from Fox. It is plain that this initial contact with Williams was within the scope of Fox's employment with Fidelity First.

Thereafter, Williams "told [ ] Fox about [her] situation" and he told her "he could help [ ] with refinancing" her mortgage.

Her testimony made clear that she believed that she was obtaining a refinance loan through Fidelity First, not participating in a side transaction with Fox and Dan whereby she would sell her house to Dan.

The loan to Dan was central to the fraud on Williams. As discussed, on his loan application, Dan made material misrepresentations concerning his income, assets, and the length of time he had been working for his current employer. It is a rational inference that these misrepresentations permitted Dan to qualify for the loan and to procure an interest rate low enough to allow the scheme to be profitable.

Fox was the loan officer on Dan's loan. He assisted Dan in completing the application, just as he would have assisted any borrower. He collected the documentation supporting the application. Dan's loan application was reviewed by a loan processor with Fidelity First in the ordinary course of business. While Eubanks testified that he had never personally reviewed Dan's loan application, the jurors were free to disbelieve this testimony and credit Fox's testimony that Eubanks reviewed *every* loan file before it was sent to a lender. After the loan closed, Fidelity First received $5,128.11 in fees,[13] which it split evenly with Fox. We conclude that this evidence was legally sufficient to prove that Fox's involvement in the origination of Dan's mortgage loan to purchase Williams's house was "incident to the performance of the duties entrusted to him by [Fidelity First]" and "in furtherance of" Fidelity First's business.

The foreseeability of Fox's conduct also informs our analysis. Here, Eubanks had reason to expect that Fox was engaging in foreclosure rescue transactions because Fox had discussed his "side business" with Eubanks and informed him that it was extremely profitable. There was evidence from

---

**13.** Fidelity First states that this fee was not paid by Williams, but by Dan, as the borrower on the loan. Given the nature of the fraud scheme, however, Williams's proceeds were used to cover Dan's expenses.

which the jurors could infer that Eubanks had knowledge of, tolerated, and even participated in forgery so long as the end result was that the loans closed, thereby generating fees for the company.

A reasonable juror also could infer from the evidence concerning the small size of the business and Dan's troubled tenure at Fidelity First that Eubanks would have recognized his name on the loan application. A cursory review of the loan application would have revealed, at the very least, that Dan was misrepresenting his employment history. The loan application was nonetheless approved and forwarded to a lender. Thus, while the specific misrepresentations made to Williams may not have been foreseeable, that Fox might make misrepresentations to increase his commissions would have been.

Finally, Fox testified that he sought out distressed buyers to participate in his and Dan's foreclosure rescue scheme in part to "add[ ] to [his] numbers at the end of the month," i.e., to increase his closing rate in his position with Fidelity First. There was ample evidence at trial that Eubanks encouraged competition among the loan officers to see who could achieve the highest closing rate; that loan officers who failed to produce enough loans in a given month would be subjected to ridicule; and that failure to produce ultimately would lead to termination, as occurred with Dan. Given all of this evidence, a reasonable juror could infer that Fox's foreclosure rescue scheme, while in furtherance of his own interests, also was incidental to the performance of his job duties and in furtherance of Fidelity First's interest in closing loans. *See* RESTATEMENT (SECOND) OF AGENCY, § 236 ("Conduct may be within the scope of employment, although done in part to serve the purposes of the servant or of a third person.").

Application of the *East Coast Freight Lines* factors identified in *Sawyer*, yields the same result. Fox's initial contact with Williams in response to a Fidelity First solicitation letter, his offer to assist her to refinance her home mortgage, and his origination of Dan's fraudulent loan application all were conduct "of the kind [he was] employed to perform." The entire fraud scheme was consummated during his employment with

Fidelity First—"a period not unreasonably disconnected from the authorized period of employment." The vast majority of Fox's contacts with Williams occurred in and around Annapolis, "a locality not unreasonably distant from the authorized area," and, by his own testimony, Fox's scheme was "actuated at least in part by a purpose to serve the master" in that it generated origination fees for Fidelity First.

We also reject Fidelity First's argument that the fact that Fox intentionally engaged in a criminal scheme removed his conduct from being within the scope of his employment. As already discussed, criminal and intentionally tortious conduct is not necessarily outside the scope of employment. While Fox's scheme violated federal and state law, as Fidelity First points out in its brief, foreclosure rescue schemes are not *per se* illegal. The facts of this case are quite dissimilar to the types of intentional, criminal acts that the Court of Appeals has held fall outside the scope of employment. *See Sawyer,* 322 Md. at 247, 587 A.2d 467 (police officer acting outside of the scope of his employment when he threw rocks at and attacked two men unrelated to any lawful traffic stop or attempted arrest); *Wolfe v. Anne Arundel County,* 374 Md. 20, 821 A.2d 52 (2003) (police officer not acting within the scope of employment when, after effecting a lawful traffic stop, he took the driver to a church parking lot and raped her); *Henley v. Prince George's County,* 305 Md. 320, 330 n. 2, 503 A.2d 1333 (1986) (carpentry instructor not acting within the scope of employment when he raped and murdered a child).

For all of the above-stated reasons, we conclude that the foreclosure rescue scheme perpetrated by Fox while employed by Fidelity First was within the scope of his employment. Accordingly, we perceive no error in the denial of the motions for judgment or for JNOV on this basis.

### III.

### Vicarious Liability for Punitive Damages

Fidelity First next contends that, even if there was sufficient evidence to sustain the verdict in favor of Williams as to

fraud and breach of fiduciary duty, it was error for the circuit court to permit the jury to award punitive damages based solely on a theory of vicarious liability. This is so, it argues, because Maryland appellate court decisions permit an award of punitive damages only upon a showing that the defendant acted with actual malice, *i.e.*, consciousness of wrongdoing, and, according to Fidelity First, this state of mind may not be imputed to an employer. Williams responds that this argument ignores basic precepts of *respondeat superior* and principles of agency.

In *Embrey v. Holly*, 293 Md. 128, 442 A.2d 966 (1982), the Court of Appeals held that an employer may be liable for punitive damages arising from the tortious conduct of its employee. In *Embrey*, a local television news commentator, Dennis Holly, sued a local radio show host, James Embrey, Jr., known as "Johnny Walker," and Embrey's employer, Baltimore Radio Show, Inc., alleging that Embrey made defamatory remarks about Holly during his radio show. A jury found for Holly, awarding $25,000 in compensatory damages against both Embrey and his employer; $5,000 in punitive damages against Embrey; and $35,000 in punitive damages against his employer. On appeal to this Court, we affirmed the judgment, but vacated the punitive damages award, remanding for further proceedings.

The Court of Appeals granted *certiorari* only on the issue of the propriety of the punitive damages award—specifically, whether punitive damages may be awarded solely on the basis of *respondeat superior* in a defamation case without violating the First Amendment and whether apportionment of the damages was permissible. With respect to *respondeat superior*, the Court opined that while "the master's liability for compensatory damages in the usual case is beyond question, it is far from universally accepted that the master can, on similar principles, be held responsible in punitive damages for its employee's tortious acts." *Id.* at 134, 442 A.2d 966. At that time, a majority of courts had adopted the rule that an employer could be held vicariously liable for punitive damages based upon the conduct of its employee and that this was

"equally true where the employer is a corporation." *Id.* (footnote omitted). A "substantial minority" of courts held, in contrast, that an employer only could be held liable for punitive damages arising out of the tortious conduct of an employee if the employer had "authorize[d], participate[d] in, or ratifie[d] the employee conduct." *Id.*

Noting that the split in authority rested "upon philosophical grounds," the Court addressed the policy considerations implicated by an award of punitive damages premised on *respondeat superior. Id.* at 135, 442 A.2d 966. On the one hand, such an award could be viewed as punishing a non-culpable party for acts it did not commit. On the other hand, such an award could have the beneficial effect of causing employers to more carefully monitor their employees to avoid liability in tort. The Court held that Maryland follows the majority rule: that punitive damages can be vicariously imposed "on the master for acts of the servant committed during the course of his employment without regard to whether the master authorized, participated in, or ratified the employee's conduct." *Id.* Quoting *Boyer & Co. v. Coxen,* 92 Md. 366, 368, 48 A. 161 (1901), the Court explained the underlying rationale as follows:

> "Any liability of the master for a tort of his servant is dependent upon the fact that the servant was acting at the time in the course of his master's service, and for his benefit, within the scope of his employment. The master selects him for that service and knows, or ought to know, what sort of a person he is investing with authority to act for him. The servant is acting for his master when the wrong is done—it is in contemplation of law the act of the master."

*Id.* at 136, 442 A.2d 966. Thus, in Maryland, "the tortious act of the servant done in the course of his employment is ordinarily the legal act of the master, and in this sense, the employer is not free of 'fault.'" *Id.* Emphasizing this point, the Court quoted at length from a decision of the Supreme Court of Maine, in which it opined as follows with respect to corporate liability for the acts of its servants:

"A corporation is an imaginary being. It has no mind but the mind of its servants; it has no voice but the voice of its servants; and it has no hands with which to act but the hands of its servants. All its schemes of mischief, as well as its schemes of public enterprise, are conceived by human minds and executed by human hands; and these minds and hands are its servants' minds and hands. All attempts, therefore, to distinguish between the guilt of the servant and the guilt of the corporation; or the malice of the servant and the malice of the corporation; or the punishment of the servant and the punishment of the corporation, is sheer nonsense; and only tends to confuse the mind and confound the judgment."

*Id.* at 137, 442 A.2d 966 (quoting *Goddard v. Grand Trunk Ry.*, 57 Me. 202, 223–24 (1869)).

The Court then turned to the petitioners' argument that it should adopt an "exception" to the " 'broad' rule of vicarious liability for punitive damages" "in light of the policy of free expression fostered by the first amendment." *Id.* at 137–38 (footnote omitted). Ultimately, the Court concluded that no such exception was required constitutionally and that the policy justifications for permitting awards of punitive damages based on vicarious liability overrode any concern that free expression would be stifled.

Chief Judge Robert C. Murphy dissented, concluding that, in the context of a suit for defamation, the Court of Appeals should adopt the test set forth in the RESTATEMENT (SECOND) OF TORTS, § 909 (1979), which provides:

Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

(a) the principal or a managerial agent authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or

(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act.

Adoption of such a test "requiring some degree of employer authorization, participation, or ratification" was, according to Chief Judge Murphy, "constitutionally impelled" in a defamation case. 293 Md. at 145, 442 A.2d 966.

Ten years later, in *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 427, 601 A.2d 633 (1992), the Court of Appeals granted *certiorari* in two consolidated actions in which punitive damages in tort cases, specifically, asbestos injury cases, was at issue. The Court sought to "reconsider some of the principles governing awards of punitive damages in tort cases." *Id.* at 428, 601 A.2d 633. Fidelity First contends that *Zenobia* implicitly overruled *Embrey.* We disagree.

In *Zenobia,* the plaintiffs each had been exposed to asbestos in the course of their employment in the late 1940s through early 1960s and each had developed pleural and parenchymal asbestosis. The plaintiffs sued numerous manufacturers and suppliers of asbestos-containing products, including Owens–Illinois, Inc. ("O–I"). The cases were tried purely on the theory of strict liability. The jury awarded each plaintiff more than one million dollars in compensatory damages and awarded punitive damages against certain of the defendants, including awards in favor of each plaintiff in the amount of $235,000 against O–I.

After this Court affirmed the punitive damages awards against O–I, the Court of Appeals granted *certiorari* and reversed. As relevant here, the Court addressed the proper standard for the grant of punitive damages under Maryland law. Specifically, it considered "what basic standard of wrongful conduct should be used for the allowance of punitive damages in negligence actions generally, and in products liability actions based on either negligence or on strict liability." *Id.* at 451, 601 A.2d 633.

The Court explained that the jurors had been instructed, and this Court had reasoned, that an award of punitive damages can be premised on a finding that the defendant

acted with "implied malice," that is, he engaged in grossly negligent conduct or conduct evincing "a wanton and reckless disregard for the rights of others." *Id.* at 451–52, 601 A.2d 633. In contrast, "actual malice" is "characterized by evil motive, intent to injure, fraud, or actual knowledge of the defective nature of the products coupled with a deliberate disregard of the consequences." *Id.*

In deciding the appropriate standard for the allowance of punitive damages, the Court reexamined two lines of cases. First, it considered whether to retain the "arising out of contract" distinction in the standard for punitive damages, as set forth in *H & R Block v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975), and *Wedeman v. City Chevrolet,* 278 Md. 524, 366 A.2d 7 (1976); and second, it considered whether the "implied malice" standard for punitive damages adopted in *Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 297 A.2d 721 (1972), should have any continued applicability in negligence and other non-intentional tort cases. The Court decided to abandon the "arising out of contract" distinction, explaining that the distinction did not further the dual "historical purposes of punitive damages—punishment and deterrence." *Id.* at 454, 601 A.2d 633. These purposes were served when punitive damages were awarded "in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability." *Id.* In keeping with these purposes, the Court also overruled *Smith, supra,* and its progeny, holding that, "[i]n a non-intentional tort action, the trier of facts may not award punitive damages unless the plaintiff has established that the defendant's conduct was characterized by . . . 'actual malice.' " *Id.* at 460, 601 A.2d 633 (footnote omitted).

Since *Zenobia,* the Court of Appeals has made clear in a variety of contexts that the actual malice standard also applies to the allowance of punitive damages in intentional tort cases. Of importance here, in *Hoffman v. Stamper,* 385 Md. 1, 867 A.2d 276 (2005), the Court emphasized that, although an action for fraud may be sustained based upon a showing that a

defendant made a false representation to the plaintiff and that the falsity of that statement was *"either* known to the defendant *or that the representation was made with reckless indifference as to its truth,"* an award of punitive damages premised on fraud requires a showing of "conscious and deliberate wrongdoing." *Id.* at 41–42, 867 A.2d 276.

There is no dispute that Williams presented clear and convincing evidence that Fox made false statements to her—including, for example, that he would assist her in refinancing her mortgage loan—and that he did so with knowledge of the falsity of the statements. According to Fidelity First, however, *Zenobia* implicitly overruled *Embrey* and requires a showing of actual malice as to each defendant against whom punitive damages are claimed. Thus, punitive damages may not be awarded against an employer based purely upon a finding that *an employee* acted with actual malice. It urges us to hold that the Court of Appeals "would adopt in whole or in part the minority rule proposed by Chief Judge Murphy in his dissent in *Embrey,"* that is, that we adopt Section 909 of the RESTATEMENT (SECOND) OF TORTS, known as the "complicity rule." [14]

*Zenobia* neither expressly nor implicitly overruled *Embrey.* Indeed, the *Zenobia* Court cited *Embrey* to support the proposition that the historical purposes of punitive damages are served when such damages are awarded "based upon the heinous nature of the defendant's tortious conduct.". 325 Md. at 454, 601 A.2d 633. Otherwise it did not discuss *Embrey* or disavow that decision's "broad" view of the purposes of permitting *respondeat superior* liability for punitive damages.

Moreover, the *Zenobia* Court's holding that punitive damages may be allowed only when the defendant is shown to have acted with consciousness of wrongdoing does not run counter to *Embrey.* The doctrine of *respondeat superior* treats an employee's tortious conduct as "the legal act" of the

---

**14.** As discussed, Chief Judge Murphy's dissent did not propose adoption of this Rule generally, but only with respect to defamation actions.

employer. *Embrey,* 293 Md. at 136, 442 A.2d 966. The employer is thus deemed to be "at fault" for the employee's conduct. *Id.* Where an employee commits a tort within the scope of his employment and there is clear and convincing evidence supporting a finding that he acted with actual malice, that conduct may support an award of punitive damages against an employer premised on *respondeat superior. See, e.g., Hoffman,* 385 Md. at 1, 867 A.2d 276(reversing the circuit court's determination to withhold from the jury a punitive damages claim against a mortgage lender arising from frauds perpetrated on borrowers based solely on a theory of vicarious liability for an employee loan officer's conduct). For all of these reasons, we find no merit in Fidelity First's contention that punitive damages are not recoverable when the defendant's liability is vicarious.

## IV.

### Violations of PHIFA

Fidelity First contends the trial court erred in denying its motion for judgment and JNOV as to the PHIFA claim because that act was inapplicable to Williams; Fidelity First did not itself engage in any of the practices proscribed by the act; and the act "does not provide for vicarious liability" for violations. Williams responds that Fidelity First is "liable for all torts committed by its employee [Fox] with[in] the scope of employment, including statutory torts."

The Court of Appeals has explained PHIFA's origins as follows:

PHIFA was enacted in 2005 as emergency legislation in order to protect financially distressed homeowners from con artists who would convince the owners to transfer title to their property to "investors" and enable the scammer to take the equity in the home or the value of the house less the money owed on it. [RP s]ections 7–301 to 7–321 [ ] originated as Senate Bill 761 and House Bill 1288, and the resulting enactment became effective on October 1 as Chapter 509 of the Maryland Laws of 2005. The preamble to the

statute provides that the legislation was intended, in pertinent part, "FOR the purpose of . . . prohibiting foreclosure consultants and foreclosure purchasers from engaging in certain practices; requiring a homeowner to be provided with copies of certain documents; providing that certain provisions in certain documents are void; prohibiting certain documents from being recorded within a certain period; . . . ."

*Julian v. Buonassissi*, 414 Md. 641, 673–74, 997 A.2d 104 (2010) (footnotes omitted).

As relevant here, PHIFA defines the term "foreclosure consultant" to include a person who "[s]olicits or contacts a homeowner [15] . . . and directly or indirectly makes a representation or offer to perform any service that the person represents will . . . [a]ssist the homeowner to obtain a loan or advance of funds" or "[a]rrange for the homeowner to become a lessee or renter entitled to continue to reside in the homeowner's residence." RP § 7–301(b)(1)(vi) & (x). The act prohibits a "foreclosure consultant" from entering into an oral or written agreement with a homeowner to sell his or her home without "[f]ully disclos[ing] the exact nature of the foreclosure consulting service to be provided, including any foreclosure reconveyance that may be involved, and the total amount and terms of any compensation to be received. . . ." RP §§ 7–301(c); 7–306; 7–307(7). There is no dispute that Fox was a "foreclosure consultant" under the act and engaged in conduct prohibited by the act.[16] Moreover, for the reasons

---

**15.** "Homeowner" is elsewhere defined to include "the record owner of a residence in foreclosure." RP § 7–301(i).

**16.** The act further prohibits a "foreclosure purchaser" from participating in a "foreclosure reconveyance" transaction without verifying that the homeowner has a "reasonable ability" to repurchase the property within the term of any option to repurchase; representing to a homeowner that a foreclosure reconveyance transaction will help the homeowner to "save the house"; or otherwise misleading the homeowner about the terms of the transaction. RP § 7–311(b). A "foreclosure purchaser" is "a person who acquires title or possession of a deed or other document to a residence in foreclosure as a result of a foreclosure reconveyance." RP § 7–301(e). A "foreclosure reconveyance" in-

already discussed, *supra,* he engaged in the prohibited conduct while acting within the scope of his employment.

Fidelity First nevertheless argues that PHIFA was inapplicable because the property was not "a residence in foreclosure" when Williams sold it to Dan because the foreclosure proceeding had been stayed by the filing of her bankruptcy petition. A "residence in foreclosure" is any residence "against which an order to docket or a petition to foreclose has been filed." RP § 7–301(j). By its plain language, the statute does not limit its coverage to residences against which there exists an *active* foreclosure proceeding, however.

■ Second, Fidelity First argues that, under the version of PHIFA in effect at the time of the Williams transaction, licensed mortgage brokers were exempt from its coverage. RP section 7–302(a)(7) then provided that PHIFA did not apply to a "person licensed as a mortgage broker ... while acting under the authority of that license." [17] Fidelity First raised the exemption argument for the first time in its motion for JNOV, however. For this reason, we conclude that this issue is not properly before us on appeal. *See* Md. Rule 2–532(a)(a party may move for judgment notwithstanding the verdict "only if that party made a motion for judgment at the close of all the evidence and *only on the grounds advanced in support* of the earlier motion.").

■ Finally, Fidelity First contends, with no citation to any relevant legal authority, that the evidence that Fox violat-

---

cludes "[t]he transfer of title to real property by a homeowner during or incident to a proposed foreclosure proceeding," including transfer by the homeowner to another party. RP § 7–301(f). There is no dispute that Dan was a foreclosure purchaser and that the Williams transaction was a foreclosure reconveyance.

17. PHIFA did apply to a mortgage broker "engaging in activities or providing services designed or intended to transfer a residence in foreclosure directly or indirectly to [the broker], or to an agent or affiliate of [the broker]." RP § 7–302(b)(2). As discussed, there was evidence that Fox, while acting in the scope of his employment, originated a mortgage loan that was "designed [and] intended to transfer a residence in foreclosure directly to" Dan, an affiliate of Fox.

ed PHIFA does not subject it to liability because PHIFA does not expressly provide that an "employer [may be] vicariously liable for its employees' violations." The doctrine of *respondeat superior* is founded on principles of agency, however, and numerous courts have held that these principles apply both to common law and statutory torts. *See, e.g., Fearnow v. Chesapeake & Potomac Tel. Co.,* 104 Md.App. 1, 50–54, 655 A.2d 1 (1995)(determining that a telephone company would not be vicariously liable for its employee's violations of the Maryland Wiretap Act to the extent the employee was acting outside of the scope of his employment), *rev'd in part on other grounds,* 342 Md. 363, 676 A.2d 65 (1996). We conclude that an employer may be held vicariously liable for its employee's violations of PHIFA.

## V.

### Attorneys' Fees

■ Finally, Fidelity First contends that, because "[e]vidence of a plaintiff's reasonable attorney's fees is admissible and can be considered by a jury in determining the amount of punitive damages," an award of attorneys' fees and punitive damages "based upon the same underlying conduct[ ] is duplicative and nothing more than an attempt to 'enlarge' the award." Fidelity First acknowledges, however, that Williams did not present evidence at trial bearing on her costs and fees. Moreover, the cases cited by Fidelity First in support of this proposition involve awards of both statutory treble damages (which, as mentioned, were disallowed) and punitive damages and are thus inapposite. We perceive no error in the award of statutory attorneys' fees.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY FIDELITY FIRST HOME MORTGAGE COMPANY.**