REPORTED
IN THE COURT OF SPECIAL APPEALS
OF MARYLAND
No. 1024
September Term, 2013

JAMES WILLIAM FOX, II

v.

FIDELITY FIRST HOME MORTGAGE
COMPANY

Meredith,
Graeff,
Leahy,

JJ.

Opinion by Graeff, J.

Filed: July 1, 2015

This case arose from a fraudulent foreclosure rescue scheme initiated by appellant, James William Fox, II, who was employed as a loan officer with Fidelity First Home Mortgage Company ("Fidelity First"), appellee. One of the victims, Charlene Williams, sued Fidelity First, which was found liable under a theory of *respondeat superior* and ordered to pay damages.

Fidelity First then filed a complaint in the Circuit Court for Prince George's County against Mr. Fox and another individual, seeking indemnification.[1] It alleged that "the fraudulent mortgage rescue scheme scam" perpetrated by Mr. Fox was within the scope of his employment with Fidelity First, and Mr. Fox and the other individual were "solely responsible to Fidelity First for any and all damages imposed by the jury on Fidelity First or, in the alternative, are joint tortfeasors." Mr. Fox argued that the claims for indemnification and contribution were discharged in bankruptcy.

The circuit court granted summary judgment in favor of Fidelity First. It found that, because the claim against Mr. Fox was based on fraud, it was nondischargeable in bankruptcy. Accordingly, it ordered judgment in favor of Fidelity First and against Mr. Fox and another employee for indemnification and contribution in the amount of $340,583.98, plus costs.

On appeal, Mr. Fox presents the following questions for our review, which we have rephrased as follows:

---

[1] This other individual, James Dan, is not a party to this appeal.

1. Did the circuit court err in granting summary judgment in favor of Fidelity First where Mr. Fox previously received a discharge in a no-asset Chapter 7 bankruptcy case, and no determination was made that such claim was nondischargeable under the Bankruptcy Code?

2. Did the circuit court err in granting summary judgment on Fidelity First's indemnification claim where the jury found Fidelity First negligent, and the record reflected a dispute of material fact whether Fidelity First's conduct was passive?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.

### The Initial Litigation

The factual background underlying this appeal was set forth by this Court in the appeal from the initial tort action. *Fidelity First Home Mort. Co. v. Williams*, 208 Md. App. 180 (2012). We shall reiterate only those facts necessary to resolve this appeal.

Ms. Williams sued Fidelity First, Mr. Fox, and James Dan, alleging that Mr. Fox and Mr. Dan had engaged in a fraudulent foreclosure rescue scheme that caused her to lose title to, and be deprived of, the equity in her home. *Id.* at 183. She alleged that Fidelity First, Mr. Fox's employer, was vicariously liable for fraud, breach of fiduciary duty, and violations of the Protection of Homeowners in Foreclosure Act. *Id.* Ms. Williams subsequently dismissed her claims against Mr. Fox and Mr. Dan and proceeded solely against Fidelity First, asserting that Mr. Fox and Mr. Dan were acting within the scope of their employment, and Fidelity First was vicariously liable on the basis of *respondeat superior*. *Id.* at 184.

At trial, the evidence showed that Mr. Fox was hired as a loan officer for Fidelity First, a mortgage broker. He became an excellent producer and was rewarded with higher commission rates. *Id.* at 186. On at least three occasions, however, he was caught forging documents. He was reprimanded and suspended, but he was not terminated. *Id.*

The foreclosure rescue scheme began in 2006. *Id.* at 187. Mr. Fox would identify distressed homeowners who were unable to qualify for traditional mortgage refinancing due to poor credit, but who owned equity in their homes. *Id.* Mr. Fox advised these distressed homeowners that he could assist them in refinancing their mortgages by using his or Mr. Dan's own credit. *Id.* The homeowners were convinced that they could avoid losing their homes to foreclosure by selling their homes to Mr. Fox, Mr. Dan, or a straw buyer, and remaining in the properties as tenants. *Id.* Mr. Fox and Mr. Dan promised that they would pay the mortgages on the properties for six months to a year, at which time the homeowners would be able to re-acquire title to their properties. *Id.*

To facilitate the property purchases, Mr. Fox, Mr. Dan, or a straw buyer would apply for and obtain a mortgage in their own name. *Id.* In at least three of the approximately eight transactions, Fidelity First was the mortgage broker. *Id.* The loan applications contained materially false representations with respect to the borrower's income, assets, and intent to occupy the home, among other things. *Id.*

Ms. Williams was the homeowner in the third transaction, which took place in August 2006. *Id.* at 188. Ms. Williams had been having financial problems and ceased making her

mortgage payments. *Id.* Her lender initiated foreclosure proceedings against her. *Id.* Ms. Williams received a solicitation letter from Fidelity First, advising her that she had been pre-approved for a lower interest rate and/or debt consolidation. *Id.* The letter was signed "Shawn Murphy Director of Customer Service Fidelity First." *Id.* at 189. Shawn Murphy was not an employee of Fidelity First, but rather, he was a fictitious person named after a friend of Daniel Eubanks, the president and sole owner of Fidelity First. *Id.* Mr. Eubanks assigned different names to the different types of solicitation letters that Fidelity First sent to potential borrowers, so when the potential borrower called, the person receiving the call would be able to identity the type of solicitation the potential borrower had received. *Id.*

Ms. Williams called Fidelity First in response to the solicitation letter. *Id.* Mr. Fox took the call and informed Ms. Williams that he could assist her in refinancing the mortgage on her property. *Id.* Mr. Fox determined, however, that Ms. Williams would not qualify for a refinance loan. On May 11, 2006, Ms. Williams executed a written contract to sell the property to Mr. Dan for $225,000. *Id.* The next day, Mr. Dan applied for a mortgage loan with First National Bank of Arizona. *Id.* at 190. Mr. Fox was the loan officer on the application, and Fidelity First was the mortgage broker. *Id.* On his application, Mr. Dan made numerous misrepresentations about the amount of his annual income, his savings, and the real property he claimed to own. *Id.* Mr. Dan's mortgage application was approved by a loan processor for Fidelity First. *Id.* In the ordinary course of business, this mortgage

-4-

application also would have been reviewed by Mr. Eubanks, but Mr. Eubanks denied having reviewed this particular file. *Id.*

On August 4, 2006, settlement occurred. *Id.* Ms. Williams signed a deed, which conveyed the property to Mr. Dan, as well as the HUD-1 settlement sheet and other related papers. *Id.* She also signed a contingent deed that would transfer ownership back to her after several years, which document was to be held by the settlement attorney for three years. *Id.* Ms. Williams believed that she was refinancing the mortgage on her house using Mr. Dan's credit.

At settlement, Ms. Williams received a check for $63,893.79 in net proceeds from the sale. *Id.* at 191. Shortly after settlement, she endorsed that check to Mr. Dan, and he cashed it. *Id.* He gave Ms. Williams $3,000 in cash and told Ms. Williams that the remaining amount would be held in escrow to pay her mortgage. *Id.* In actuality, Mr. Dan deposited the remaining proceeds of sale into his own personal checking account. He used $44,420.07 to pay settlement costs. *Id.* at 190-91. Mr. Fox and Mr. Dan split the remaining balance.

In October 2006, Ms. Williams received another check in the amount of $11,804.62 from the title company, which represented a refund for overpayments made to her creditors out of the settlement proceeds. *Id.* at 191. Mr. Fox called Ms. Williams and convinced her to endorse the check over to him. *Id.* She did, and he gave her $3,000 in cash, telling her that the remaining amount would be deposited into escrow. *Id.* Instead, it was deposited in Mr. Fox's personal checking account. *Id.*

Although Ms. Williams thought the mortgage was in her name, and she was paying the loan with the money that Mr. Fox and Mr. Dan were holding in escrow for her, the mortgage actually was in Mr. Dan's name, and Ms. Williams essentially was making rental payments. *Id.* at 192. Ms. Williams learned that she no longer owned the property in 2007, when she was served with an eviction notice. *Id.* She learned that she was "a tenant in [her] own home," and that Mr. Dan's mortgage was in foreclosure. *Id.* Although she tried to contact the mortgage lender, its representatives would not speak to her because her name was not on the loan. *Id.*

In December 2009, Mr. Fox and Mr. Dan were indicted in federal court for wire fraud and conspiracy to commit wire fraud. *Id.* Mr. Fox ultimately pleaded guilty pursuant to an agreed statement of facts. *Id.* at 193.

Ms. Williams' case against Fidelity First went to trial on February 7, 2011. Mr. Fox and Mr. Dan testified about their involvement in the foreclosure scheme and the culture at Fidelity First. *Id.* Mr. Fox described the considerable pressure for loan officers to produce, and he stated that the failure to produce would lead to termination. *Id.*

Mr. Eubanks denied knowledge that Mr. Fox and/or Mr. Dan were engaging in fraud prior to the transaction with Ms. Williams. *Id.* at 196. He explained that the transaction with Ms. Williams was the first of the foreclosure rescue transactions in which the loan originated through Fidelity First. Following that transaction, Mr. Fox originated two more loans

through Fidelity First, but Mr. Eubanks testified that neither of those transactions were on his "radar." *Id.*

The jury returned a verdict in favor of Ms. Williams. *Id.* The jury indicated on the verdict sheet that Fidelity First, acting through one or more of its agents, committed fraud, breached its fiduciary duty, and violated the Maryland Homeowner's Protection in Foreclosure Act. It also found that Fidelity First was negligent in its retention or supervision of Mr. Fox. The jury awarded Ms. Williams $70,000 in compensatory damages. It awarded $150,000 in punitive damages based on its finding that the conduct engaged in by Fidelity First, through one or more of its agents, amounted to fraud and/or breach of fiduciary duty.

On appeal to this Court, Fidelity First asserted, *inter alia*, that the evidence was insufficient to support the jury's findings that it negligently supervised and retained employees. *Id.* at 184-85. We disagreed, holding that there was evidence from which a reasonable juror could infer that Mr. Eubanks "tolerated and even encouraged forgery in the pursuit of closing more loans," *id.* at 199, and that Mr. Eubanks was aware of the foreclosure rescue scheme transactions. *Id.* at 200. With respect to *respondeat superior*, Fidelity First argued that the evidence of Mr. Fox's fraud,"did not support a reasonable inference that [he] was acting within the 'scope of his employment' at the time of the tortious conduct" because, although his initial contact with Ms. Williams arose out of his role as loan officer, once he began participating in the foreclosure rescue scheme, he ceased acting within the scope of his employment. *Id.* at 201. We disagreed, holding that a reasonable juror could find that

Mr. "Fox was acting within the scope of his employment when he perpetrated the fraudulent scheme against [Ms.] Williams." *Id.* at 204. We explained that the jurors "were free to disbelieve" Mr. Eubanks' testimony that he did not review the loan file in Ms. Williams' case, *id.* at 205, and to find that Mr. Eubanks "had reason to expect that [Mr.] Fox was engaging in foreclosure rescue transactions because [Mr.] Fox had discussed his 'side business' with [Mr.] Eubanks and informed him that it was extremely profitable.'" *Id.* We explained that:

> There was ample evidence at trial that [Mr.] Eubanks encouraged competition among the loan officers to see who could achieve the highest closing rate; that loan officers who failed to produce enough loans in a given month would be subjected to ridicule; and that failure to produce ultimately would lead to termination . . . . Given all of this evidence, a reasonable juror could infer that [Mr.] Fox's foreclosure rescue scheme, while in furtherance of his own interests, also was incidental to the performance of his job duties and in furtherance of Fidelity First's interest in closing loans.[2]

*Id.* at 206.

**B.**

**The Litigation at Issue on Appeal**

On March 22, 2011, subsequent to the verdict in the underlying action, Fidelity First filed a complaint against Mr. Fox and Mr. Dan, alleging that Ms. Williams' damages were proximately caused by the acts or omissions of Mr. Fox and Mr. Dan, and therefore, Mr. Fox

---

[2] We did not consider in that case, as it was not an issue presented to us, whether Mr. Eubanks' conduct amounted to fraud, thereby rendering Fidelity First's involvement active, as opposed to passive.

and Mr. Dan were "solely responsible" to Fidelity First for the damages the jury awarded to Ms. Williams. Mr. Fox answered by denying the allegations in the complaint, and he did not assert any affirmative defenses.

On December 27, 2011, Fidelity First filed a motion for summary judgment, asserting that there were no material facts in dispute because Mr. Fox previously had testified to his involvement in the fraudulent mortgage rescue scheme and his intent to defraud his victims, including Ms. Williams.[3] It argued, therefore, that "any damages to Ms. Williams resulted solely from [his] active and primary negligence and any negligence on the part of Fidelity First, if any at all, was merely passive and secondary in nature." Accordingly, Fidelity First

---

[3] The motion stated that Mr. Fox had pleaded guilty in federal court to wire fraud and conspiracy to commit wire fraud in connection to these fraudulent schemes, and it attached a copy of the agreed statement of facts in that case, which included the following:

In order to obtain the mortgage loans in his name, Fox made materially false and fraudulent loan applications including falsification of his intent to occupy the property, annual income, savings, other properties owned, and source of the borrower's funds for closing. Dan did as well. Fox was typically the loan officer for Dan's loans and was aware of Dan's material misrepresentations.

Fox and Dan attended settlements on these properties which were required to be conducted according to the financial terms and conditions specified by the mortgage lenders and set forth on the settlement statements (sometimes called HUD-1s). These HUD-1s were false. The source of funds for the closing and the disposition of the sales proceeds materially varied from the HUD-1 which was furnished to the lender as set forth in more detail below. Fox was motivated to enter these transactions because he received a portion of the seller's proceeds which were set forth on Line 603 of the HUD-1, even though Fox (or Dan) was the buyer.

sought indemnification and contribution. Attached to the motion were the transcripts from the initial litigation.

On February 24, 2012, Mr. Fox, *pro se*, filed an opposition, asserting that there were genuine issues of material fact in dispute. In particular, he pointed to Mr. Eubanks' own conduct, and he argued that any issue of active, independent negligence on the part of Fidelity First had not been litigated. He asserted that Mr. Eubanks "orchestrated Fidelity's corruption," directed Mr. Fox to "conduct unlawful activity," "encouraged employees to falsify documents," and "completely controlled" Mr. Fox's work activities. Mr. Fox did not raise his discharge in bankruptcy. Mr. Fox also made his own motion for summary judgment, on the grounds of res judicata or collateral estoppel, asserting that the issues raised in the complaint were, or should have been, raised in the initial litigation.

On March 23, 2012, the court denied both motions for summary judgment. It stated that "there are still genuine disputes of material fact."

On October 25, 2012, Fidelity First filed a second motion for summary judgment, asserting that "[a]ny damages it owes to Ms. Williams resulted solely from the active and primary negligence of Fox and Dan. No direct liability on the part of Fidelity First was alleged by Ms. Williams and the jury verdict was based upon a finding of vicarious liability." It attached Mr. Fox's trial testimony in the Williams' case, as well as the agreed statement of facts from the federal case. Fidelity First stated that it was "undisputed that Fox and Dan perpetrated the fraud against Ms. Williams which gave rise to her cause of action against

Fidelity First for respondeat superior," and "[b]oth Fox and Dan admitted to the underlying fraudulent conduct and for which they were found to have acted within the scope of employment." It argued that there were no material facts in dispute with respect to its claim for indemnification and contribution.

Mr. Fox did not file an opposition to Fidelity First's second motion for summary judgment. Instead, on November 9, 2012, Mr. Fox filed in the United States Bankruptcy Court for the District of Maryland a motion to reopen a Chapter 7 voluntary bankruptcy case that he originally filed on January 16, 2009.[4] Mr. Fox asserted that, pursuant to 11 U.S.C. § 524(a)(2) of the Bankruptcy Code, a discharge under § 727 of the Bankruptcy Code "'operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not the discharge of such debt is waived.'" He sought to include Fidelity First as a creditor, as the events giving rise to Fidelity First's claim for indemnification and contribution occurred prior to his original bankruptcy petition date. He conceded that "Fidelity First was not scheduled as a creditor" in the bankruptcy case "because it[s] claims were not asserted until well after" the bankruptcy case was closed.

_____

[4] On January 16, 2009, Mr. Fox filed Bankruptcy Petition # 09-10795 in the United States Bankruptcy Court for the District of Maryland, seeking voluntary discharge, in a "no-asset" case, under Chapter 7 of the Bankruptcy Code. Fidelity First was not scheduled as a creditor in the petition. On April 29, 2009, the Bankruptcy Court entered an order granting a discharge under Section 727 of Title 11 of the Bankruptcy Code. Mr. Fox's bankruptcy case was then closed.

Furthermore, as the "Chapter 7 Trustee reported this as a 'no asset' case, . . . the claims of unscheduled creditors," including Fidelity First, "were discharged." Thus, he sought to reopen the case to "add Fidelity First as a creditor, and to enforce the discharge injunction."

On November 13, 2012, Mr. Fox filed in the circuit court a notice of discharge, discharge order, and discharge injunction, asserting for the first time that he had filed a voluntary bankruptcy petition under Chapter 7 of the Bankruptcy Code. He argued that the order by the Bankruptcy Court granting a discharge operated as an injunction against the continuation of the case. The circuit court stayed the proceedings pending a decision from the Bankruptcy Court.

On November 15, 2012, the Bankruptcy Court issued a memorandum order denying Mr. Fox's motion to reopen his Chapter 7 case to add Fidelity First as a creditor, finding that "[n]o ground exists to reopen the case." It stated:

> [T]he failure by the Debtor[s] to list the Creditor does not automatically deprive the Debtor(s) of a discharge of the claim held by the Creditor. 11 U.S.C. § 523(a)(3) prevents the discharge of an unlisted claim if the failure to schedule the claim results in that Creditor being deprived of the opportunity to timely file a proof of claim. In addition, if the claim is of a kind which would have been held nondischargeable by reason of false pretenses, fraud, willful and malicious injury, as more fully set forth in 11 U.S.C. §§ 523(a)(2), (4), or (6), the failure to schedule the claim will prevent the discharge of the unscheduled claim where such failure also prevented the Creditor from filing a timely request for determination of dischargeability.
>
> Because this bankruptcy case was a no asset case, the notice sent to creditors who had been scheduled did not contain a deadline for filing proofs of claims. Accordingly, the failure to schedule the Creditor did not deprive the Creditor of the opportunity to timely file a proof of claim; and it therefore appears that the Creditor's claims may have been discharged, even though it

-12-

had not been scheduled. If the Creditor's claim arises from fraud, misrepresentations, willful or malicious injury, as more fully set forth in 11 U.S.C. § 523(a)(2), (4), or (6), that claim may not have been discharged. Further, if one of the other exceptions to discharge in 11 U.S.C. § 523(a) is found to be applicable to the Creditor's claim, the claim will not have been discharged.

The Debtor(s) may raise the issue of discharge in a non-bankruptcy court as a potential defense to collect[ion] litigation. The non-bankruptcy court has concurrent jurisdiction with the bankruptcy court to determine if a Debtor(s)' discharge applies to a particular claim. Consequently, if the Creditor alleges that the claim on which suit is brought is nondischargeable, the non-bankruptcy court may rule whether the claim is discharged.

Accordingly, the Bankruptcy Court determined that it was not necessary to reopen the case, and it denied Mr. Fox's motion.

On January 9, 2013, the circuit court lifted the stay. It gave Mr. Fox 18 days to respond to the motion for summary judgment.

On January 25, 2013, Mr. Fox, through counsel, filed a "Response To Order Lifting Stay And Motion For Summary Judgment; And Notice of Discharge, Discharge Order, And Discharge Injunction." He did not request a hearing.

Mr. Fox asserted that, as "provided in the Bankruptcy Court Order, the claims of unscheduled creditors are discharged in a no asset case, unless an exception from discharge under Section 523(a)(2), (4) or (6) of the Bankruptcy Code applies." He argued that, "unless a determination is made that one of the exceptions from discharge listed in Section 523(a)(2), (4) or (6) of the Bankruptcy Code applies, the claims of Plaintiff have been discharged in the Chapter 7 case," and therefore, the circuit court was required to "make the threshold

-13-

determination of whether any of Plaintiff's claims are excepted from discharge under Section 523(a)(2), (4) or (6) of the Bankruptcy Code." He further argued that, under the Bankruptcy Code, "a creditor must commence an adversary proceeding to determine the dischargeability of a debt which is procedurally subject to the Bankruptcy Rules," and if Fidelity First "believes that any exceptions to discharge apply, it should amend the [circuit court] Complaint or file other appropriate pleadings seeking such relief and asserting such allegations which would support any such determination." Moreover, he stated that, if Fidelity First "believes that it is entitled to summary judgment on any of the exceptions from discharge duly raised by [it], then it can file a motion for summary judgment at that time briefing the applicable bankruptcy law issues and asserting undisputed facts that support such legal requirements." Mr. Fox stated that, in the absence of Fidelity First asserting "in any pleading that its indemnification claim is excepted from discharge," Fidelity First's "claims . . . have been discharged in the Chapter 7 case," and "ruling on the motion for summary judgment on the indemnification claim is not appropriate at this time."

Fidelity First filed a reply to Mr. Fox's response, noting that there was "no response to Plaintiff's Motion for Summary Judgment," but rather, the response solely addressed whether the claim was dischargeable. In that regard, Fidelity First stated as follows:

> It is undisputed that claims arising from the debtor's fraud and/or misrepresentations are non-dischargeable under a Chapter 7 petition. Without providing any supporting authority, Defendant Fox contends that Plaintiff must amend its original pleading to include an allegation that its claim is subject to an exception from a Chapter 7 discharge. This . . . [c]ourt has concurrent jurisdiction with the U.S. Bankruptcy Court to determine whether Mr. Fox's

-14-

Chapter 7 discharge incorporates the instant suit, a claim for indemnification arising out of Mr. Fox's admitted perpetration of fraud and misrepresentation upon Charlene Williams, and therefore, it is not necessary for Plaintiff to amend its pleading. See attached Bankruptcy Court Order, dated November 14, 2012.

Nevertheless, Mr. Fox's attempt to retroactively discharge this claim is yet another attempt to delay these proceedings. At the time he filed his Chapter 7 Bankruptcy proceeding, Mr. Fox was already on notice of Charlene Williams' claims against him for fraud, among other things, as the actions that gave rise to her claim all occurred in 2006 and 2007, long before his 2009 bankruptcy filing. Furthermore, by virtue of the federal indictment dated December 8, 2009 and his subsequent guilty plea, Mr. Fox failed to either reopen or amend his petition at that time, despite the fact that the Williams' claim, as well as this action in which we stand in her shoes against him, have been going on since 2009. Thus, Mr. Fox had ample opportunities to raise this issue well before the time of trial and/or summary judgment.

This [c]ourt should therefore find that this claim, being non-dischargeable, is not subject to Mr. Fox's Bankruptcy petition and grant summary judgment for the reasons set forth in Plaintiff's motion and supporting memorandum.

On June 10, 2013, the court granted Fidelity First's motion for summary judgment.

The court concluded: "As this matter includes a claim for fraud, it is non-dischargeable," and

"it is clear [the case] is ripe for summary judgment." The court entered judgment in favor

of Fidelity First and against Mr. Fox and Mr. Dan for "indemnification and contribution in

the amount of $340,583.98 plus court costs."

**STANDARD OF REVIEW**

Maryland Rule 2-501(f) governs motions for summary judgment and provides that a

trial court "shall enter judgment in favor of or against the moving party if the motion and

response show that there is no genuine dispute as to any material fact and that the party in

whose favor judgment is entered is entitled to judgment as a matter of law." *Accord Reiter v. Pneumo Abex, LLC*, 417 Md. 57, 67 (2010). On appeal, we "independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Myers v. Kayhoe*, 391 Md. 188, 203 (2006). A material fact is "one that will somehow affect the outcome of the case." *Commercial Union Ins. Co. v. Harleysville Mut. Ins. Co.*, 110 Md. App. 45, 51, *cert. denied*, 343 Md. 679 (1996). We "'review[ ] the same material from the record and decide[] the same legal issues as the [circuit] court.'" *Vinogradova v. Suntrust Bank, Inc.*, 162 Md. App. 495, 505 (2005) (quoting *Lopata v. Miller*, 122 Md. App. 76, 83 (1998)). We look at the record "in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Myers*, 391 Md. at 203.

Generally, we limit our review to only the grounds upon which the trial court relied. *State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 498 (2014). *Accord Benway v. Maryland Port Admin.*, 191 Md. App. 22, 46 (2010). It is usually "the written order that constitutes the judgment of the court." *In re Justin D.*, 357 Md. 431, 445 (2000). In our review of a trial court's decision to grant summary judgment, "[i]f the trial court did not specify the grounds upon which it granted summary judgment, [we] assume that the trial court 'carefully considered all of the asserted grounds upon and determined that all or at least

enough of them . . . were meritorious.'" *Fischbach v. Fischbach*, 187 Md. App. 61, 77 (2009) (quoting *Kimmel v. SAFECO Ins. Co.*, 116 Md. App. 346, 354-55 (1997)).

## DISCUSSION

Mr. Fox contends that the court erred when it granted summary judgment in favor of Fidelity First for two reasons. First, he argues that the proper procedure was not followed to determine whether Fidelity First's claim was nondischargeable under 11 U.S.C. § 523(a) of the Bankruptcy Code. In that regard, he asserts: (1) Fidelity First failed to file, as required, a complaint or a motion "seeking to identify which exception from discharge it believed applied to this case"; and (2) the court failed to make a determination, after a hearing that Fidelity First's claim was nondischargeable.

Second, Mr. Fox contends that summary judgment was improper on the merits of the claim. He asserts that there was "ample evidence in the record to conclude that there was a genuine dispute of material fact concerning whether [Fidelity First's] negligence (either directly or through its owner and officer Dan Eubanks) was merely passive."

Fidelity First makes several arguments in response. First, it contends that Mr. Fox has not preserved the issues he raises on appeal because they were not raised in or considered by the circuit court. Second, Fidelity First argues that the court properly granted summary judgment because "there were no material facts in dispute and Fidelity First was entitled to judgment as a matter of law." In that regard, it asserts that it was undisputed that Mr. Fox "was the employee who committed the underlying fraudulent conduct for which [it] was

found vicariously liable," and Mr. Fox did "not offer any alleged, material, factual disputes." It asserts that the awards for punitive damages and attorney's fees could "only have been awarded by virtue of Fox's fraudulent misconduct and statutory violations." Citing Maryland law providing that an employer who is found liable under the doctrine of *respondeat superior* for the tortious conduct committed by its employees may recover the full amount of its loss from the employee, *see Hartford Accident & Indemnity Co. v. Scarlett Harbor Associates*, 109 Md. App. 217, 277 (1996), *aff'd on other grounds*, 346 Md. 122 (1997), combined with Mr. Fox's failure to even respond to Fidelity First's substantive argument regarding its right to indemnification and contribution, Fidelity First argues that the court's grant of summary judgment was proper.[5]

Third, with respect to Mr. Fox's argument regarding the circuit court's finding that the debt was nondischargeable, Fidelity First argues that this ruling was legally correct. It asserts that, if Mr. Fox wanted a hearing on this issue, he should have asked for one. Because he did not, the circuit court did not err in ruling on the issue without a hearing.

---

[5] Fidelity First also argues that this Court lacks jurisdiction to review the Bankruptcy Court's November 15, 2012, order. We construe Mr. Fox's argument to be about the circuit court's order, not the Bankruptcy Court's order, so we need not address this argument.

# I.

## Discharge of Debt

We address first Mr. Fox's contention that the court erred in determining that, although he had obtained a discharge in bankruptcy, Fidelity First's claim was nondischargeable. Before doing so, a brief discussion of bankruptcy law is warranted.

## A.

## Bankruptcy Law

Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 727(b), allows a debtor to obtain a discharge "from all debts that arose before the order of relief," except as provided in § 523. *Marvin v. Marvin*, 659 S.E.2d 579, 581 (Va. Ct. App. 2008). Section 523(a) lists nineteen exceptions to discharge, i.e., debts that are excluded from a debtor's discharge. *In re Candidus*, 327 B.R. 112, 116 (E.D.N.Y. 2005). Because "the exceptions are all factually and legally based, a dispute may arise between the debtor and the creditor regarding whether the debt was discharged or not." *In re Mitchell*, 418 B.R. 282, 286 n.3 (B.A.P. 8th Cir. 2009). In that situation, a court will "determine whether the legal and factual predicates for an exception to discharge exist and therefore determine whether the debt was discharged or not." *Id.*

There are four categories of debt excepted from discharge under § 523(a) that are relevant to this case. Debts listed in § 523(a)(2), (4), and (6) encompass claims arising out of: (1) "actual fraud, false pretenses or false representations" ((a)(2)); (2) "fraud or

-19-

defalcation while acting in a fiduciary capacity, embezzlement or larceny" ((a)(4)); and (3)

"willful or malicious injury to person or property" ((a)(6)). *In re Candidus*, 327 B.R. at 116.

These debts sometimes are referred to as "intentional tort debts." *Id.*

The Court in *Candidus* explained the procedure involved for a creditor to determine

the nondischargeability of an intentional tort debt, as follows:

> What is so special about the intentional tort debts is that they will be automatically discharged, unless the creditor files a complaint in the bankruptcy court to determine their dischargeability within a strict time limit of 60 days from the date first set for the meeting of creditors. *See* 11 U.S.C. § 523(c); Fed. R. Bankr.P. 4007(c). Section 523(c) also grants the bankruptcy court exclusive jurisdiction to determine the dischargeability of the intentional tort debts. *See* Fed. R. Bankr.P. 4007 advisory committee's note (1983); 4 *Collier on Bankruptcy* ¶ 523.26[1] at 523–129 (15th ed. rev.2004).

> These time and jurisdictional limitations do not apply to any of the other fifteen categories of debt excepted from discharge under § 523(a), including § 523(a)(3). A complaint to determine dischargeability of debts other than intentional tort debts may be filed at any time. Fed. R. Bankr.P. 4007(b). Jurisdiction to determine dischargeability of these categories of debt is held concurrently by the bankruptcy court and any appropriate non-bankruptcy forum. *See* 28 U.S.C. § 1334(b); Fed. R. Bankr.P. 4007 advisory committee's note (1983).

*Id.* at 116-17.

A fourth category of debt excepted from discharge under § 523(a) that is relevant to

this case is debt "neither listed nor scheduled" in the bankruptcy petition. 11 U.S.C. §

523(a)(3). As the Court in *Candidus* explained:

> [Section] 523(a)(3)(B) excepts unscheduled debt from discharge, where the creditor, due to the absence of notice or actual knowledge of the bankruptcy filing, failed to timely exercise his right to obtain a dischargeability determination of debts "of a kind specified in" § 523(a)(2), (4), or (6). Thus,

§ 523(a)(3)(B) protects the right of an unscheduled creditor to obtain a determination of nondischargeability of intentional tort debts, and helps vouchsafe the public policy that debts discharged in a Chapter 7 case are only debts honestly incurred.

*Id.* at 117.

In sum, a debtor's failure "'to schedule a fraud debt or otherwise inform the creditor of the bankruptcy is forfeiture of the right to enjoy exclusive federal jurisdiction and loss of the sixty-day limitations period applicable in the exclusive jurisdiction actions.'" *In re Bartomeli*, 303 B.R. 254, 269 (D. Conn. 2004) (quoting *In re Franklin*, 179 B.R. 913, 924 (E.D. Cal. 1995)). *In re Steward*, 509 B.R. 123, 127 (W.D. Mich. 2014) ("[A] debtor who omits a creditor from his or her schedules runs the risk that the creditor's claim will be excepted from discharge under § 523(a)(3)(B) and that a court other than the United States Bankruptcy Court may be called upon to make that determination."); *In re Taylor*, 49 B.R. 416, 419 (N.D. Tex. 1985) ("The determination of dischargeability under § 523(a)(3), unlike such determinations under § 523(a)(2), (4), or (6), is of the type over which the Bankruptcy Court has concurrent, but not exclusive jurisdiction.") (quoting *In re McNeil*, 13 B.R. 743, 747 (S.D.N.Y. 1981)). And as one court has noted: "'Conceivably, the debtors would prefer to litigate this issue in the federal bankruptcy forum where discovery devices, rules of evidence and case law may be more compatible with their objectives than those pertaining in the state courts.'" *In re Taylor*, 49 B.R. at 419 (quoting *In re McNeil*, 13 B.R. at 747).

Accordingly, because Mr. Fox did not schedule Fidelity First as a creditor in his bankruptcy case, the circuit court had concurrent jurisdiction to construe the discharge "'and

-21-

determine whether a particular debt is or is not within the discharge.'" *Howard v. Howard*, 336 S.W.3d 433, 442 (2011) (quoting *Sunbeam Corp. v. Dortch*, 313 S.W.3d 114, 116 (Ky. 2010)). The issue before the court was whether the debt was nondischargeable because it was "of a kind specified in" § 523(a)(2), (4) or (6). *See* § 523(a)(3)(B); *In re Candidus*, 327 B.R. at 117.

## B.

## Procedure to Determine Whether Debt is Discharged

Mr. Fox contends that, before even addressing "the merits of the dischargeability issue," "there is a procedure which must be followed which was completely ignored in this case." He argues, citing § 523(c)(1) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4007, that an intentional tort debt can be found nondischargeable only after a complaint is filed and a hearing is held.

Section 523(c)(1) provides as follows:

> Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section.

*See* Fed. R. Bankr. P. 4007 (a creditor may file a "complaint to obtain a determination of the dischargeability of a debt" within "60 days after the first date set for the meeting of creditors"). Mr. Fox asserts error here because there was no complaint filed, no

-22-

identification of the exceptions Fidelity First believed were applicable, no discovery, and "no determination of non-dischargeability after notice and a hearing."

The *Candidus* court noted four ways to obtain a judicial determination of dischargeability:

> i) if the creditor pursues a lawsuit on the claim, the debtor can assert the bankruptcy discharge as an affirmative defense and the court with jurisdiction over the lawsuit can decide whether the debt falls within any of the exceptions to discharge, ii) the debtor may be able to remove the collection effort to the bankruptcy court, iii) either the debtor or the creditor can move to reopen the bankruptcy case pursuant to Fed. R. Bankr.P. 4007(b) for the purpose of filing a complaint to determine dischargeability, and iv) the debtor can bring an action against the creditor in the bankruptcy court to enforce the § 524(a)(2) discharge injunction.

*In re Candidus*, 327 B.R. at 118. Here, after failing in his quest to reopen the bankruptcy case, Mr. Fox opted to pursue the affirmative defense avenue in state court.

Mr. Fox's argument, that pursuant to § 523(c)(1) and Rule 4007 Fidelity First had to file a separate complaint in state court to obtain a determination of nondischargeability and the court was required to hold a hearing prior to determining if the debt was excepted for discharge, is without merit. This argument ignores the plain language of § 523(c)(1), which sets forth the procedure "[e]xcept as provided in subsection (a)(3)(B)." As indicated, § 523(a)(3)(B) addresses the situation here, an unscheduled intentional tort debt. Thus, the statute itself provides that the requisite procedures set forth in § 523(c)(1) do not apply here. Indeed, Mr. Fox has not cited any case holding that a state court with concurrent jurisdiction

-23-

regarding whether a debt is covered by a bankruptcy court discharge must follow the federal court procedure.

To be sure, a state court must apply the substantial federal law regarding whether a particular debt is covered by a bankruptcy discharge. *See In re Goodwich*, 517 B.R. 572, 583 (D. Md. 2014). With respect to procedural matters, however, "'[t]he law of the forum governs.'" *Goodwich v. Sinai Hosp. of Baltimore, Inc.*, 343 Md. 185, 205 (1996) (quoting *Rein v. Koons Ford*, 318 Md. 130, 147 (1989)). There is no procedural provision in Maryland law that requires a creditor to file a separate complaint in response to a debtor asserting the affirmative defense of discharge of debt. Nor is there a requirement for the court to hold a hearing on this issue, prior to rendering its decision, when no hearing was requested. *See* Md. Rule 2-311(f) (a party desiring a hearing on a motion shall request one). Accordingly, we reject Mr. Fox's argument that the circuit court committed procedural errors in its resolution of this case.

## C.

### Fraud Claims Are Not Dischargeable

We turn next to the merits of the court's determination that Fidelity First's claim was not discharged by the bankruptcy case. Section 523(a)(2) of the Bankruptcy Code provides that a discharge pursuant to § 727 "does not discharge an individual debtor from any debt . . . (2) for money, property, services . . . obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial

condition." The circuit court found that, because the case "includes a claim for fraud, it is non-dischargeable."

Mr. Fox does not dispute that he engaged in fraud in connection with his dealings with Ms. Williams. Rather, he asserts that "the underlying lawsuit was a claim for indemnification - not fraud," and because Fidelity First "has not alleged that [he] defrauded it," the claim is not covered by the fraud exception. We disagree.

This same argument was considered, and rejected, in *In re Saenz*, 515 B.R. 521 (S.D. Tex. 2014). In that case, the creditor, Pizza Patron, Inc. ("PPI"), a franchiser of pizza restaurants, was sued based on an allegation by a buyer of a franchise that the debtor, PPI's agent Saenz, committed fraud against the buyer. *Id.* at 524. PPI filed a Complaint for Determination of Non-Dischargeable Debt, asserting that, if it was held vicariously liable for the tortious conduct committed by Saenz, Saenz would be liable to PPI, and requesting that Saenz's liability to PPI be declared nondischargeable under § 523(a)(2). *Id.*

Saenz argued that PPI failed to state a claim for fraud under § 523(a)(2) because PPI did not allege that it was defrauded by him. *Id.* at 526-28. The court rejected this argument, stating: "[Section] 523(a)(2) does not state that the alleged fraud must be committed against the movant creditor. Nothing in this subsection precludes PPI from asserting an exception to discharge just because PPI wasn't the target of the debtor's alleged fraudulent conduct." *Id.* at 526. It explained:

> Saenz's contention that PPI must be the target of debtor's fraud in order to sustain a § 523(a)(2) claim is at odds with the Supreme Court's broad

interpretation. In [*Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998)], the Supreme Court stated that § 523(a)(2) prevents the discharge of all liability arising from fraud. In this case, accepting PPI's factual allegations as true, then any liability that Saenz would have to PPI would arise from Saenz's fraudulent conduct. Moreover, although PPI may not have been the target of debtor's fraud, PPI will be a victim of the fraud if PPI is held vicariously liable. Permitting Saenz to discharge a debt that was incurred due to his fraud merely because PPI was not the target of the debtor's fraud is inconsistent with the basic policy that bankruptcy relief is reserved for the "honest but unfortunate debtor." *See* [*Cohen*, 523 U.S. at 217] ("[t]he Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an honest but unfortunate debtor"). Accordingly, the Court rejects the argument that the fraud debt is only excepted from discharge under § 523(a)(2) if Saenz defrauded PPI.

*Id.* at 528 (footnote omitted).

We agree with that reasoning. Mr. Fox obtained money by fraud, and Fidelity First's liability arises from that fraud. Thus, even though Fidelity First was not the target of Mr. Fox's fraud, pursuant to § 523(a)(2), Mr. Fox is not entitled to discharge of the debt that was incurred due to his fraud. The circuit court properly determined that Fidelity First's claim was nondischargeable.

## II.

### Indemnification Claim

Mr. Fox next contends that the court erred in granting summary judgment on Fidelity Fox's indemnification claim because the record reflects "a dispute of material fact whether appellee's conduct was passive." He asserts: "Mr. Eubanks knowingly allowed loan officers

-26-

to engage in loan fraud, and he lured in the prospects with his own fraud. He was the one leading the sheep to the wolves. To say his role was passive is almost laughable."

Fidelity First argues that this issue is not preserved for this Court's review because Mr. Fox did not contend below "that there was a disputed material fact as to whether Fidelity First's negligence was the active cause of [Ms.] Williams' damages." Moreover, it asserts that "the circuit court was legally correct when it granted summary judgment in favor of Fidelity First as there were no material facts in dispute and Fidelity First was entitled to judgment as a matter of law." In that regard, Fidelity First states that it was undisputed that Mr. Fox was "the employee who committed the underlying fraudulent conduct for which Fidelity First was found vicariously liable," and Mr. Fox did not deny those facts or otherwise allege any material, factual disputes. Rather, his sole response to the motion for summary judgment involved his assertion that the claim had been discharged by the order of the bankruptcy court.

In responding to a motion for summary judgment, the opposing party "must identify 'with particularity the material facts that are disputed.'" *Beyer v. Morgan State Univ.*, 139 Md. App. 609, 634 (2001) (quoting *Bond v. Nibco, Inc.*, 96 Md. App. 127, 136 (1993)), *aff'd on other grounds*, 369 Md. 335 (2001). "Moreover, the opposing party must present evidence that would be admissible at trial to show the existence of a material factual dispute." *Id.* Failure to do so renders the issues unpreserved. *Id.* at 636. "Bald, unsupported statements or conclusions of law" do not generate a genuine dispute of material fact, and

therefore, they cannot defeat a motion for summary judgment. *Hoffman Chevrolet, Inc. v. Wash. County Nat'l Sav. Bank*, 297 Md. 691, 712 (1983).

Here, the undisputed facts before the circuit court on the motion for summary judgment were that Mr. Fox perpetrated a fraud upon Ms. Williams, and that Fidelity First was found to be vicariously liable for Mr. Fox's misconduct. "An employer who is liable for a tort committed by an employee under the doctrine of *respondeat superior* may, in the absence of active, independent negligence on the part of the employer, recover the full amount of its loss from the employee." *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assocs, Ltd. P'ship*, 109 Md. App. 217, 277 (1996), *aff'd on other grounds*, 346 Md. 122 (1997). There was no finding in the underlying action of active, independent negligence on the part of Fidelity First, and Mr. Fox did not assert in response to the second motion for summary judgment, the motion at issue here, that there was a material dispute of fact on this issue. Under these circumstances, the circuit court properly granted Fidelity First's motion for summary judgment. We perceive no error in this regard.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**